**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **SANDRA MYRICK,** | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 7:09-CV-5 (HL) |
| | : |
| **DOLGENCORP, LLC**, | : |
| | : |
| Defendant. | : |
| | : |
| _____ | : |

# ORDER

Pending before the Court is Defendant Dolgencorp, LLC's Motion for Summary

Judgment (Doc. 25).  For the following reasons, Defendant's Motion is denied.[1]

## I.    PROCEDURAL HISTORY AND BACKGROUND

On February 17, 2009, Plaintiff, Sandra Myrick, filed her Third Amended

Complaint against Dolgencorp, LLC ("Dollar General"), alleging violations of the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*  Myrick asserts a claim for

unpaid overtime compensation.

---

[1]Dolgencorp, LLC is the proper defendant.  This was stipulated to by the parties during a hearing held on March 5, 2009.  The **Clerk is directed** to terminate Dolgencorp, Inc., Dollar General Partners, Dolgencorp of New York, Inc., and Dolgencorp of Texas, Inc. as defendants in this action.  The docket should be corrected to show Dolgencorp, LLC as the only defendant remaining in this case.

On November 2, 2009, Dollar General filed a Motion for Summary Judgment, stating that judgment as a matter of law is warranted under the executive exemption of the FLSA, 29 U.S.C. § 213(a)(1).  The only evidence submitted by Dollar General in support of its Motion was Myrick's deposition transcript, which did not include all of the exhibits.

On November 23, 2009, Myrick filed her response to the Motion.  She argues that based on the facts presented, a reasonable jury could conclude that she was a non-exempt employee.  She also argues that Dollar General has failed to meet its burden of showing that the executive exemption is applicable to her.  If that is the case, summary judgment would be inappropriate.  The only evidence submitted by Myrick as part of her response was the Dollar General job description for the Store Manager position.

Dollar General is a retailer of basic consumable goods, including cleaning supplies, health and beauty aids, food, housewares, toys, and basic apparel.  Myrick was hired by Dollar General in March of 2000 as a clerk.  She was subsequently promoted to Assistant Store Manager of a store in Moultrie, Georgia.  In October of 2001, she was transferred to a new store in Pavo, Georgia, and received a promotion to Store Manager.  Myrick was later transferred to the Quitman, Georgia store in June of 2002.  She remained a Store Manager at the Quitman store until she was fired in

2

March of 2003.[2]  Myrick became a salaried employee when she was promoted to Store Manager.  Her immediate supervisor was the district manager.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party.  Id. at 254-55.  The Court may not, however, make credibility determinations or weigh the evidence.  Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

---

[2]The termination of Myrick's employment with Dollar General is not at issue in this case.

3

material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).  If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to a judgment as a matter of law.  <u>Id.</u> at 324-26.  This evidence must consist of more than mere conclusory allegations.  *See* <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991).  Under this scheme summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

### B.    FLSA Executive Exemption

The FLSA requires employers to pay their employees time and a half for hours an employee works in excess of a 40-hour workweek.  29 U.S.C. § 207(a)(1).  There are exceptions to this requirement, however.  Dollar General argues that the executive exemption applies in this case, which provides that the FLSA's requirements "shall not apply with respect to . . . any employee employed in a bona fide executive . . . capacity."  29 U.S.C. § 213(a)(1).

Dollar General bears the burden of proving the executive exemption affirmative defense.  <u>Morgan v. Family Dollar Stores, Inc.</u>, 551 F.3d 1233, 1269 (11th Cir. 2008).  The Eleventh Circuit has recognized the "Supreme Court's admonition that courts closely circumscribe the FLSA's exceptions."  <u>Nicholson v. World Bus. Network, Inc.</u>,

4

105 F.3d 1361, 1364 (11th Cir. 1997).  The exemption "is to be applied only to those clearly and unmistakably within the terms and spirit of the exemption."  Morgan, 551 F.3d at 1269 (quotation omitted).  Thus, the Court is required to narrowly construe exemptions to the FLSA overtime requirement.  Id.

The Eleventh Circuit does not use a "categorical approach" to decide whether an employee is an exempt executive.  Id.  "[W]e have noted the 'necessarily fact-intensive nature of the primary duty inquiry,' that 'the answer is in the details,' and that 'where an issue turns on the particular facts and circumstances of a case, it is not unusual for there to be evidence on both sides of the question, with the result hanging in the balance.'"  Id. (quotation and alteration omitted).

Department of Labor regulations interpret the executive exemption defense. Myrick's claims span between 2001 and 2003.  Accordingly, the "old regulations," which were in effect prior to August 23, 2004, apply to this case.[3]  Id. at 1265-66.  The regulations contain a short test that defines the phrase "employee employed in a bona fide executive . . . capacity."  29 C.F.R. § 541.1 (2003).  "This short test has three requirements:  (1) an employee 'is compensated on a salary basis at a rate of not less than $250 per week,' (2) his 'primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof,' and (3) his work 'includes the customary and regular direction of

_____

[3]The Court will refer to the pre-August 23, 2004 regulations, also known as the "old regulations," simply as "the regulations" for purposes of this Order.  The regulations can be found in the 2003 version of the Code of Federal Regulations.

the work of two or more other employees.'" Id. at 1266 (quoting 29 C.F.R. § 541.1 (2003)).

Myrick does not dispute Dollar General's argument or evidence showing that she met the salary requirement of the short test, or that she regularly directed the work of two other employees.[4]  Thus, the first and last requirements of the short test are met. The parties do, however, dispute the second element - whether Myrick's primary duty was management.

### 1.    Primary duty is management

The regulations provide examples of managerial tasks:

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102.

_____

[4]Myrick testified during her deposition that she was paid $500 per week when she became a store manager.  Her salary was subsequently raised to $510 per week, and then to $650 per week.  (Myrick dep., p. 39).

6

The regulations do not, however, provide a definition of "primary duty."  "A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."  29 C.F.R. § 541.103 (2003).   The regulations provide a list of factors a court should consider when determining whether an employee's primary duty is management.  These factors are:  (1) "[t]he amount of time spent in the performance of the managerial duties"; (2) "the relative importance of the managerial duties as compared with other types of duties"; (3) "the frequency with which the employee exercises discretionary powers"; (4) "his relative freedom from supervision"; and (5) "the relationship between [the employee's] salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor."  Id.; Morgan, 551 F.3d at 1267.

### a.   The amount of time spent in the performance of managerial duties

Myrick testified during her deposition that she spent 20% of her time on managerial duties, and 80% of her time on non-managerial tasks.[5]

---

[5]Myrick testified that she was required to do a great amount of non-managerial work. This included stocking the shelves, unloading the truck, cleaning the parking lot, cleaning the store, mopping the floor, cleaning the bathrooms, fixing the air conditioner, pulling merchandise from the stock room, making repairs to the store, purging the stock room, and doing recovery.  While Myrick could have designated these tasks to another employee, she typically could not because  there was normally only one other employee in the store with her. Thus, if Myrick had a clerk mop the floors, Myrick would have to run the cash register, which is still non-managerial work.  (Myrick dep., pp. 32, 66, 162-64, 167, 197, 205-06, 210-11, 276).

Myrick also testified that she did managerial work.  This included interviewing potential employees, reviewing the revenue reports, completing various paperwork, ordering merchandise, evaluating employees, preparing the work schedules, receiving mail, hiring

The regulations state that "an employee who spends over 50 percent of his time in management would have management as his primary duty." 29 C.F.R. § 541.103 (2003). Taking Myrick's testimony as true, she does not meet the 50% threshold. However, "[t]ime alone . . . is not the sole test," and "in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." 29 C.F.R. § 541.103 (2003). Thus, the Court must consider the other four factors.[6]

b. **The relative importance of the managerial duties as compared with other types of duties**

The Court must examine the importance of Myrick's duties in light of their value to Dollar General. *See* Dalheim v. KDFW-TV, 918 F.2d 1220, 1227 (5th Cir. 1990). Dollar General argues that Myrick's managerial duties were most important, as she had more impact on store profitability than any other employee, and was responsible for ensuring profitability. Because of her efforts, the Quitman store "turned around."

---

some employees, investigating customer complaints, and reviewing store policies. (Myrick dep., pp. 33, 54, 70, 77, 94, 95-96, 99, 130-32, 166, 175, 227, 250).

Myrick was required to complete her paperwork at night after the store closed, and on occasion took the paperwork home with her. (Myrick dep., p. 281). It normally took her an hour every day to do the required paperwork. (Myrick dep., p. 131). Myrick had to perform this managerial task after store hours because "[w]hile I was at the store I was always busy doing something else. Didn't have time to do paperwork." (Myrick dep., p. 281).

[6]Dollar General agrees that the other four factors must be evaluated in light of Myrick's testimony. (Doc. 25-2, p. 6).

(Myrick dep., p. 52).  Myrick also testified that if the store manager leaves the store, "things don't get done."  (Myrick dep., p. 173).  Dollar General also argues that the importance of Myrick's managerial tasks is evidenced by the Store Manager job description and the criteria on which she was evaluated as a Store Manager.  Finally, Dollar General argues that the importance of Myrick's managerial duties was reflected in the fact that Dollar General paid her a higher salary and she had bonus potential.

        While Myrick did testify in her deposition that she thought the Store Manager had the most impact on store profitability (Myrick dep., p. 173), when asked what she thought had more impact on the profitability of the stores, the managerial duties (scheduling, employee training, hiring, watching for inventory shrink, ensuring customer satisfaction) or the non-managerial duties (cleaning the bathroom, stocking the shelves, sweeping the floor), Myrick testified that "[i]t all goes together."  (Myrick dep., p. 174). Later, Myrick testified that some of the most important job duties she had as a Store Manager for Dollar General were "provid[ing] superior customer service, leadership." (Myrick dep., p. 274).  When asked what went into those tasks, Myrick identified making sure the store was stocked and clean, and making sure inventory got out on the floor.  Id.  These were all manual labor tasks that Myrick had to do herself because she did not have enough employees to do them.  (Myrick dep., p. 276).  And while Myrick did testify that she turned the Quitman store around through her efforts, when asked what she did differently than the previous store manager, Myrick stated that she

9

"actually put the merchandise on the floor." (Myrick dep., p. 52). When asked if she did anything else, Myrick testified, "No. That's basically it." Id.

Dollar General argues that Myrick has raised no issue of fact to dispute that Dollar General found her managerial duties to be of significant importance, and again points to the facts that Dollar General paid Myrick a higher salary and evaluated her on her managerial duties. Dollar General states that Myrick admitted to performing the duties outlined by the Store Manager job description, and that testimony further shows that Myrick performed managerial duties, rather than non-exempt duties. While a review of Myrick's deposition confirms that she testified that she performed the job functions outlined in the job description, her testimony shows that her physical labor was required to meet these goals, including "facilitat[ing] the efficient staging, stocking and storage of merchandise by following defined company work processes," "ensur[ing] that all merchandise is presented according to established practices, . . ." and "maintain[ing] a clean, well organized store, facilitat[ing] a safe and secure working and shopping environment." (Doc. 26-3, p. 2).

Dollar General contends that what Myrick believed her most important duties to be is unimportant, as an employee's primary duty is "what [the employee] does that is of principal value of the employer. . . ." (Doc. 27, p. 6). Dollar General repeatedly states that the focus must be on what the employer values, not what the employee subjectively believes her employer values. Yet, the only evidence before the Court is Myrick's subjective testimony about what she thought was and was not important.

10

Dollar General makes the conclusory statement that it found Myrick's managerial duties to be of significant importance, but provides no evidence to support that conclusion. It is not for the Court to guess or assume on summary judgment that a higher salary or a bonus means that Dollar General valued one set of duties over another. Dollar General wants to have it both ways. At one point, it states that "Plaintiff's principal value to Dollar General was her management of her stores, as she herself testified." (Doc. 25-2, p. 15). But when Myrick points to portions of her testimony which support her position that there is an issue of fact as to whether her managerial or non-managerial duties were more important, Dollar General replies that what Myrick believes to be more important is irrelevant and her opinions as to the duties she believes added the most value should be disregarded. (Doc. 27, pp. 6-7). The Court will not accept Myrick's testimony when it is favorable to Dollar General's position and ignore it when it is favorable to her own.

Dollar General has not presented sufficient evidence to meet its burden of showing that Myrick's managerial duties were of principal value to Dollar General.[7] Thus, this factor does not favor Dollar General.

---

[7]It should also be noted that many of Myrick's managerial tasks were also performed by non-salaried employees. For instance, Assistant Store Managers could open the store, close the store, make bank runs, check-in the truck if the manager was not there, access the safe, and prepare the nightly bank deposits. (Myrick dep., pp. 31-32, 129, 156). The Assistant Store Manager could also be put in control of the entire store, as happened when Myrick was the Store Manager at the Pavo store and was required on two or three occasions to go to a Moultrie store and clean all day. (Myrick dep., pp. 162-64).

### c.    Frequency with which an employee may exercise discretionary powers

Dollar General next argues that Myrick exercised tremendous discretion on a daily basis.  Specifically, Myrick exercised discretion with respect to scheduling her subordinates' hours, apportioning payroll budgets, delegating, assigning, and prioritizing tasks, training employees, counseling employees, appraising employee performance, resolving customer service issues, determining who to hire or fire, and how to best implement company policies and procedures.  Dollar General states that Myrick's managerial discretion was not fettered by the company's standard operating procedure manual because she testified that she did not know such a manual existed. Dollar General further notes that Myrick was the highest store-level supervisory personnel in her stores, and she "determined what was important and what needed to be done."  (Myrick dep., p. 231).

When asked during her deposition how much discretion she felt like she had to run her own store, Myrick replied, "Not a lot."  (Myrick dep., p. 276).  Myrick points to this testimony to show that she did not frequently exercise discretionary powers.  To rebut Dollar General's allegation that she exercised discretion every day in the store, Myrick relies on her deposition testimony that she was severely restricted in the way in which employees were scheduled because of the labor budget she was assigned, that she would be asked questions if she exceeded the labor budget, that she had limited discretion over how to apportion the payroll budget as 40% of it had to be

devoted to truck day, and that she could not exercise discretion over delegating and assigning tasks because there was usually only one other employee in the store with her at a time, which meant that she could not delegate non-managerial tasks, as she would end up having to do non-managerial work either in running the register or stocking shelves, for example. (Myrick dep., pp. 70-71, 112, 167, 275).

In <u>Morgan</u>, the Eleventh Circuit found that the evidence presented regarding the frequency with which the employee exercised discretionary power supported the jury's verdict in favor of the employees. The plaintiffs presented evidence that store managers rarely exercised discretion because either the store's manuals or the district managers controlled the store's operations. "The manuals and other corporate directives micro-managed the days and hours of store operations, the number of key sets for each store, who may possess the key sets, entire store layouts, the selection, presentation, and pricing of merchandise, promotions, payroll budgets, and staffing levels." 551 F.3d at 1270.

Myrick's testimony shows that Dollar General decided who had keys to the stores and how many were issued, set the weekly payroll budget, decided what merchandise was ordered, set the store hours of operation, and set the store and merchandise layouts, other than in approximately 25% of the store, and even that discretion could be overridden by the district manager. (Myrick dep., pp. 69, 76-77, 128-29, 199-200, 277, 287-88). Furthermore, Myrick had no discretion to deviate from or change the

13

company's planogram.[8]  (Myrick dep., p. 277).  She also testified that even if she ordered merchandise, that did not mean she would receive it, as Dollar General could decide not to send it to her.  (Myrick dep., p. 77).

Looking at the evidence in the light most favorable to Myrick, the discretionary power factor does not favor Dollar General, or is at least neutral.

### d.    The employee's relative freedom from supervision[9]

Dollar General argues that Myrick operated autonomously for the most part, as she had limited contact with her district manager, had an office she kept locked that only the Assistant Store Manager had access to, was the only employee with a key to the back door of the stores, and was unaware of the company's standard operating procedures.  (Myrick dep., pp. 46, 49-50, 129, 161, 233).

A review of Myrick's testimony shows that on at least one occasion, the district manager personally directed Myrick to stock merchandise.  Before any repairs could be made at the stores, Myrick had to get approval from Dollar General's home office. When Myrick took a set of keys from an employee whom she believed to be stealing from the store, the district manager made Myrick give the keys back to the employee.

---

[8]Though the Dollar General "planogram" is referred to several times, neither party provided an explanation of what it is.  The Court gleans from Myrick's testimony and the briefs filed by the parties that a planogram is some sort of a blueprint that designates certain locations in the store for the placement of merchandise.

[9]The Court notes that factor 3, the ability to exercise discretionary powers, and factor 4, relative freedom from supervision, overlap to some degree.  Thus, facts discussed in connection to one factor may also be applicable to the other factor.

If employees got into a dispute, Myrick had to refer them to the corporate resolution office.  Myrick did not have the authority to set rates of pay or recommend raises. When Myrick wanted to take a day off from work, she had to get approval from the district manager.  Myrick could only discipline employees for serious infractions after receiving approval from the district manager.  The district manager instructed Myrick to spray the parking lot with Round-Up and to make repairs to the eaves of the Quitman store.  On at least one occasion, Myrick was required to lend her employees to another store.  Myrick could not mark down damaged goods or make special orders without the district manager's approval.  The district manager at least once made Myrick relocated products she had put in a purported "flex" area of the store.  Myrick had to have the district manager's approval before hiring an Assistant Store Manager, though she never actually hired one.  When Myrick asked for more hours for her store because she did not have enough manpower to get all of the required work done, the request was refused.[10]   Myrick never terminated any employee without the district manager's approval.  The district manager was in charge when the stores did inventory, and also checked the paperwork completed by Myrick to make sure she did it right.  (Myrick dep., pp. 46-49, 63-64, 100-102, 113-114, 175, 188, 197, 202, 220-21, 227, 256, 258, 276, 285,  287-88).

---

[10]When Myrick told her district manager that she could not run the store on the labor budget she had been given, his response was that she needed to try harder.  She took this to mean that she personally needed to "work more hours and have less people there during the day."  (Myrick dep., p. 283).

The evidence presented by Myrick could support a finding that she was not relatively free from direct supervision.  Thus, this factor does not weigh in favor of Dollar General.

> ### e. The relationship between the employee's salary and the wages paid other employees for the kind of non-exempt work performed by the supervisor

When Myrick first became a store manager at Pavo, she was paid $500 weekly. She later received a raise to $510 weekly.  After her move to the Quitman store, Myrick was paid $650 weekly.  She was paid this flat rate for all hours worked.  (Myrick dep., p. 39).  Myrick testified that she worked an average of 66 hours per week.  (Myrick dep., p. 122).  She also earned annual bonuses as a Store Manager of $1,474.59 in 2002 and $1,500 in 2003.[11]  (Myrick dep., p. 140).

Using Myrick's figure of 66 hours per week, she made $7.58 per hour when first made a store manager, then $7.73 per hour, and finally $9.85 per hour.[12]  According to documents produced by Dollar General, Assistant Store Managers earned $7 per hour and clerks generally earned $5.35 per hour.[13]

---

[11]Assistant Store Managers were also eligible to receive a bonus, which Myrick did in 2001.

[12]If the $1,500 bonuses are factored into the salaries, Myrick was paid $8.01 per hour, then $8.16 per hour, and finally $10.28 per hour.  These small additional amounts, all under $0.50 per hour, do not change the Court's analysis.

[13]The Court finds no merit to Dollar General's argument that it is improper for Myrick to convert her salary to an hourly basis for comparison purposes.  The Eleventh Circuit in Morgan relied on the exact method used by Myrick.  Dollar General relies on Moore v. Tractor Supply Co., 140 Fed. Appx. 168 (11th Cir. 2005), to support its argument that dividing Myrick's salary by the hours she claims to have worked is improper.  Moore has no precedential value,

The evidence in <u>Morgan</u> showed that assuming a 60-hour week, store managers earned approximately $2 to $3 more per hour than hourly-paid assistant store managers.  The Eleventh Circuit found that "[g]iven the relatively small difference between the store managers' and assistant managers' hourly rates, it was within the jury's province to conclude that this factor either did not weigh in Family Dollar's favor or at least did not outweigh the other factors in Plaintiffs' favor."  551 F.3d at 1271. Similarly, Myrick made, at most, $2.85 more per hour than the Assistant Store Managers.[14]  As this difference in pay is similar to that in <u>Morgan</u>, this factor does not weigh in Dollar General's favor, or at least, is neutral as to whether management was Myrick's primary duty.

## III.   CONCLUSION

It is Dollar General's burden to show that the executive exemption applies in this case.  It has failed to establish each element of the exemption.  As a question of fact exists as to whether Myrick's primary duty was management, Dollar General's Motion for Summary Judgment (Doc. 25) is denied.  This case will be set for trial during the next term of court.


**SO ORDERED**, this the 11th day of January, 2010.

---

as it is an unpublished opinion.  *See* 11th Cir. R. 36-2.

[14]If the bonus is figured in, Myrick made $3.28 more per hour than the Assistant Store Managers.

17

_s/   Hugh Lawson_
**HUGH LAWSON, SENIOR JUDGE**

mbh